JOSEPH P. TOMS, Respondent, *v.* THE BUFFALO CREEK RAILROAD COMPANY, Appellant.

*Employer and employee — negligence — railroad switchman injured while uncoupling cars — starting of the locomotive — alleged defective locomotive valve.*

In an action brought by a railroad switchman, against the company by which he was employed, to recover damages for a personal injury caused by a train moving and crushing his arm between the cars which he was engaged in uncoupling, the plaintiff alleged that the accident was caused through a defective valve in the train locomotive, which caused the locomotive to start. The evidence showed, however, that the alleged defect in the valve, known as "cocking" or "lifting," could cause it to operate of itself only when the engine was in motion propelled by steam, not when it was standing still, and that the train was standing still when the plaintiff went between the cars, and then started, causing the accident, and that the engineer was managing the locomotive at the time.

*Held,* that the only conclusion to be drawn from the evidence as to the cause of the accident, was that the engineer, from some cause which he failed to explain, while the engine and train were standing still, let on the steam, and pushed the cars together, and that the accident was caused by his and not the company's negligence;

That there was nothing in the case justifying the jury in finding that the valve was faulty in its construction, or was out of repair at the time of the accident;

And that a verdict should have been directed for the defendant.

APPEAL to the General Term of the Superior Court of Buffalo by the defendant, the Buffalo Creek Railroad Company, from a judgment of the Superior Court of Buffalo, entered in the office of the clerk of that court on the 7th day of July, 1886, upon the verdict of a jury in favor of the plaintiff, and from an order denying the defendant's motion for a new trial made upon the minutes.

Two of the judges of the Superior Court of Buffalo being disqualified to hear the appeal, it was certified into the Supreme Court.

*A. D. Scott,* for the appellant.

*Porter Norton,* for the respondent.

LEWIS, J.:

The plaintiff recovered a verdict in the month of August, 1882, against the defendant for injuries sustained by him alleged to have been caused by the negligence of the defendant.

The defendant is a steam railroad in the city of Buffalo. The

plaintiff at the time of receiving his injuries was in its employ as a switchman.

His complaint alleges that it was part of his duty as such switchman to go in between cars for the purpose of coupling and uncoupling them; that there was on the day he was injured a train composed of a locomotive and twelve cars belonging to the defendant and under its management and control, and that he was directed by the defendant to go in between two of the cars for the purpose of uncoupling them, that after the locomotive and cars had come to a stop he went in as directed, and that without any notice or warning to him and without any signal being given and without any one causing it so to do, the locomotive started and pushed the train so as to bring the cars plaintiff was attempting to uncouple together in such a manner that his arm was caught between the cars and crushed; that the machinery of the locomotive was at that time in such a defective and insecure condition that the engine was liable to become unmanagable, and that because of such defects it on this occasion started and moved the train and caused the injuries, and that its defective, unsafe and insecure condition was and had for a long time prior thereto been known to the defendant.

The alleged defect was in a valve the office of which was to regulate the flow of steam used in propelling the locomotive. The plaintiff's evidence tended to show that on some occasions previous to the time of the accident this valve had failed to obey the lever of the engine, that when it was lifted by the steam from its seat it had on one or more occasions failed to drop back into its proper place and had tilted over upon its side and thereby permitted the steam to continue to flow so that the engineer was not able to stop the locomotive. This falling over of the valve was called by the witnesses "cocking of the valve."

The mechanism and operation of this valve and the functions it was intended to perform were very minutely and particularly described by the witnesses. From the view we have taken of the case we do not deem it necessary or profitable to more particularly describe the valve or its operation.

All the witnesses testified that when the engine was standing still the valve must necessarily be in its proper position and properly perform its functions and prevent the flow of steam. They all

agreed that the act of cocking could only occur when the engine was being propelled by steam.

As stated, the complaint alleged that the train was standing still when plaintiff attempted to uncouple the cars. Plaintiff testified: "William Murray, the assistant, told me to cut off two cars. I went in and pulled the pin. It was pretty hard work. It was one of those pins you could not get out altogether, and I gave him the signal to go ahead and shove the car on the side track and he gave the engine steam. The pin dropped in and a couple of the cars went together again. I could not pull the pin until he stopped, and I gave him the signal to stop and he stopped and I went in. Upon working the pin the cars came ahead and caught me over the elbow. * * * When I went in between the cars the second time the train had stopped and the timbers of the cars that I went between were three or four inches apart. There was slack enough to pull the pin if it had not stuck. There was no signal given by me nor by any other person to my knowledge to start the train. When I went in between the cars they had stopped; and I couldn't see any signal when I was working at the pin, but the cars came upon me. When working at this pin my elbow was between the timbers; what they call the deadwood, a piece of wood that saves the drawheads from coming together. I was shaking the pin and trying to loosen it and my arm came in that position."

William Briggs, a witness called by the plaintiff, testified: "I saw the accident to Toms. I was right behind taking the numbers of the cars and he was ahead of me. * * * I know when he went in between the cars I was about thirty feet away from him, and the train was then standing still. I think it was about half a minute when he went in before I heard him holler and the cars were then just moving. I saw the cars moving, and gave the signal to stop them. They moved about thirty feet after I heard him holler. I also gave the signal for the train to stop before Toms was hurt, about a couple of minutes before. There was nobody but myself and Toms who could give any signals to the engineer for the movement of the train. * * * The cars were stopped there to get their numbers and to get them receipted. * * * The cars had been stopped a couple of minutes when the accident took place. * * * The cars started slow and easy."

The evidence of these witnesses was uncontradicted.

George L. Geyer was the engineer in charge of the engine at the time of the accident. His testimony tended somewhat to confuse the case, but if examined carefully will be found not to contradict the fact testified to by the plaintiff and Briggs, that the train was standing still when the plaintiff went in between the cars.

Geyer testified: " When Toms was hurt, I was on the engine. * * * I received a signal to stop from Toms or Briggs. The signal indicated that I should stop quick. I shut off the steam and reversed the engine. There was a slight grade at that point in the direction the engine was running, so that when I pulled up, I was on a slight grade. When I reversed the lever, it had a tendency to check the train, and the piston began to pump air back into the steam pipe. I shut off the steam. At this time we were running about six or seven miles an hour. The next thing I did was to throw the reverse lever ahead. After I had thrown the reverse lever back to shut off the steam, the engine slowed down. I heard the valve drop back on its seat about three distinct times. This indicated that if I was not careful, the valve was liable to cock. * * * It was about half a minute or forty-five seconds after I received a signal to stop before I heard the valve working up and down. The train had not then come to a standstill, but had slowed up about half, and we were then running at the rate of three or four miles an hour. When I heard the valve rise in the manner I have indicated, I opened the cylinder cocks and threw the reverse lever ahead, thereby taking off the pressure, and preventing the air from running into the steam pipe. When I did this, the engine moved ahead. I next reversed my engine back. I did not hear anything then, and the train came to a standstill. I looked out of the cab for signals and did not hear anything of Toms, but saw him come out from between the cars on the side of the track, having hold of his arm. I then came down from the engine and went up to where he was. I found that his arm was crushed."

Geyer testified that he believed, when he let on the steam, that the valve was about to cock, and that that was the reason for giving the engine the additional steam.

It will be observed that the engineer testifies that when his train was running at the rate of three or four miles an hour on a down

grade, he heard the noise of the valve rising and falling, and, fearing that it was about to cock, threw the reverse lever ahead, which caused the engine to move ahead, and that the train only moved thereafter about twenty-five or thirty feet before it came to a stop. It is quite improbable that such a train under such circumstances could be stopped in so short a distance. The account given by the plaintiff and Briggs is much more probable. They testified that the train was standing still; that the engine started and pushed the train about thirty feet before it was again stopped, and that the plaintiff thereupon came out with his arm crushed.

While the account of the occurrence as related by the engineer might lead to the inference that he looked out of his cab immediately after he stopped his train and saw the plaintiff come out holding his arm, he does not, however, testify how soon he looked out of his cab after his train stopped. His evidence is not necessarily contradictory or inconsistent with the testimony of the plaintiff and Briggs. Plaintiff's version of the transaction is undoubtedly the correct one; it coincides with his claim as stated in his complaint, and he should not have been permitted upon the trial to assume any other position.

There is but one rational conclusion to be drawn from the evidence as to the cause of the accident, and that is that the engineer, from some cause which he fails to explain, while the engine and train were standing still, let on the steam and pushed the cars together, and thereby caused the injury, and that the accident was caused by his and not the company's negligence.

As we have seen, the valve, when the engine was at rest, could not be lifted from its seat and tilted over. When the engine was in that condition the valve must necessarily and inevitably perform its proper functions in preventing the flow of steam. There is no reasonable ground for the contention that the plaintiff was entitled to recover if his version of the transaction was the correct one, and yet the learned court refused to charge, upon request of the defendant, " that if the jury find that the train was at a standstill when the plaintiff went in between the cars at the time of the accident and took hold of the coupling pin to uncouple the cars, there can be no recovery in this action." To such refusal defendant's counsel duly excepted.

The valve in question was known as "the Winans valve." It was the kind of valve in use on all the defendant's locomotives.

The plaintiff called engineers and mechanics who testified that they were familiar with the construction and parts of locomotives, but they had never known the Winans valve to be used on any other engines but those of the defendant. They described valves used upon other engines, and one of the witnesses, a machinist, after examining a diagram of the valve known as "the balance valve," was allowed, against the defendant's objection, to give his opinion of the advantages of that valve over the Winans valve, and stated that the former "is always under the control of the engineer and cannot get out of order. * * * There is no danger of the balance valve cocking." He further stated, "I could not say how it is in this regard about the Winans valve. I never saw one like it before."

A number of plaintiff's witnesses testified that if the Winans valve were kept in order there would be no liability of its sticking or cocking.

This evidence was not contradicted.

Witnesses testified that any valve if not kept in good condition might fail to work properly.

John G. Murray, a witness sworn for the plaintiff, after testifying that he had been an engineer, was asked by the plaintiff, "Do you know of other throttle valves in use upon engines where this cocking and lifting could be prevented for the purpose of supplying steam?" Defendant's counsel objected to the question as incompetent, immaterial and improper. The court in overruling the objection stated: "I think he has a right to show that this is not the best device that could be used."

The learned court, in denying the motion for a direction of a verdict for the defendant, stated: "I think there is some proof of the defective construction of this valve."

The undisputed evidence was that this engine was taken to the repair shops in the spring before the accident, and was put in good repair throughout. It went into service again on the sixteenth of June, two months before the accident occurred; the valve worked well after these repairs were made and was not known to cock thereafter.

There was nothing in the case justifying the jury in finding that the valve was out of repair at the time of the accident.

The verdict cannot be accounted for unless upon the theory that the jury was misled by the manner in which the case was submitted to them; while considering the case they must have wandered off into the field of speculation as to the merits of the Winans valve, and concluded that perhaps it was after all faulty in its construction notwithstanding that every witness who testified about it said that if it was in good order it would work well.

We do not see any ground upon which the plaintiff was entitled to recover. If plaintiff went in between the cars and attempted to uncouple them when they were in motion, it might well be doubted if he was not guilty of negligence that would prevent his recovery. But, as before stated, we do not think there is any evidence that the cars were in motion when he attempted to uncouple them, and, therefore, he was not shown to be guilty of negligence contributing to his injuries.

We put our decision upon the ground that the plaintiff failed to prove any negligence on the part of the defendant.

The defendant's motion for a direction of a verdict should have been granted. The judgment and order appealed from should be reversed and a new trial granted; with costs to abide the event.

DWIGHT, P. J., MACOMBER and HAIGHT, JJ., concurred.

Judgment and order of the Superior Court of Buffalo appealed from reversed and a new trial granted, with costs to abide the event.